UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo |
| v. | : | |
| | : | Magistrate No. 13-8106 |
| BIODIAGNOSTIC LABORATORY SERVICES, LLC, | : | |
| DAVID NICOLL, | : | **CRIMINAL COMPLAINT** |
| SCOTT NICOLL, | : | |
| CRAIG NORDMAN, and | : | |
| FRANK SANTANGELO | : | FILED UNDER SEAL |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

SEE ATTACHMENT B

Gregory Yankow, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
April 9, 2013 in Essex County, New Jersey

HONORABLE MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

1

## ATTACHMENT A

### Count 1
### (Conspiracy to Bribe Physicians)

From at least in or about January 2006, through in or about 2013, in Morris and Essex Counties, in the District of New Jersey, and elsewhere, defendants

BIODIAGNOSTIC LABORATORY SERVICES, LLC,
DAVID NICOLL,
SCOTT NICOLL, and
CRAIG NORDMAN

did knowingly and intentionally conspire and agree with each other and others to commit offenses against the United States, that is:

a. to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to physicians in order to induce referrals of patients to BLS for the furnishing and arranging for the furnishing of items and services, that is, the referral by physicians of patient blood specimens to BLS for testing and related services, for which payment was made in whole or in part under a Federal health care program, that is, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

b. to knowingly and intentionally use and cause to be used the mail and facilities in interstate commerce with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, commercial bribery, contrary to N.J.S.A. §2C:21-10 and Title 18, United States Code, Section 1952(a)(3) and, thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

### Overt Acts

In furtherance of the conspiracy, and to effect its objects, defendants committed the following overt acts in the District of New Jersey and elsewhere:

a.  On or about August 7, 2009, defendant DAVID NICOLL and defendant FRANK SANTANGELO engaged in a text message discussion regarding the amount of money defendant BLS was paying defendant FRANK SANTANGELO to refer and increase patient blood testing volume.

      b.      In or about February 2009, defendant DAVID NICOLL caused a check drawn on defendant BLS's business bank account, bearing #7614, in the amount of $1,200, to be paid to MD1, who was a physician then practicing medicine in the State of New Jersey. That payment was made pursuant to a sham lease agreement between defendant BLS and MD1 to induce MD1 to refer the blood specimens of his patients to defendant BLS for testing.

      c.      In or about February 2009, defendant DAVID NICOLL caused a check drawn on defendant BLS's business bank account, bearing #7549, in the amount of $3,466, to be paid to MD2, who was a physician then practicing medicine in the State of New Jersey. That payment was made pursuant to a sham service agreement between defendant BLS and MD2 to induce MD2 to refer the blood specimens of his patients to BLS for testing.

      d.      In or about August 2011, in a meeting with MD1, defendant CRAIG NORDMAN offered to pay MD1 $1,500 per month for MD1 to refer patient blood specimens to defendant BLS for testing, using money from defendant BLS that was funneled through another entity ("Advantech Sales, LLC") operated by defendant CRAIG NORDMAN.

      e.      On or about August 2, 2012, defendant SCOTT NICOLL engaged in a telephone conversation with MD1, and defendant SCOTT NICOLL offered to resume payments to MD1 from Advantech Sales, LLC (which payments defendant CRAIG NORDMAN had ended in or about April 2012 after MD1's referrals to defendant BLS decreased) provided that MD1 generated a sufficient volume of testing on MD1's patients' blood for defendant BLS.

      f.      On or about December 3, 2012, defendant CRAIG NORDMAN delivered a check for $1,500 to MD1 drawn on the Advantech Sales, LLC business bank account, which account was funded almost entirely by defendant BLS.

All in violation of Title 18, United States Code, Section 371.

## Count 2
### (Accepting a Bribe in Connection with a Federal Health Care Program)

From at least in or about 2006 through in or about 2013, in the District of New Jersey, and elsewhere, defendant

### FRANK SANTANGELO

did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, a bribe, from defendant BLS in return for referring patients to defendant BLS for the furnishing and arranging for the furnishing of items and services, that is, the testing of patient blood specimens and related services, for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, as described in Attachment B below.

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2.

## Count 3
### (Use of the Mail and Facilities in Interstate Commerce to Promote, Carry On and Facilitate Commercial Bribery)

From at least in or about 2006 through in or about 2013, in the District of New Jersey, and elsewhere, defendant

### FRANK SANTANGELO

did knowingly and intentionally use and cause the use of the mail and facilities in interstate commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, commercial bribery, contrary to N.J.S.A. §2C:21-10 and Title 18, United States Code, Section 1952(a)(3) and, thereafter, did perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

In violation of Title 18, United States Code, Section 1952(a)(3) and Title 18, United States Code, Section 2.

## Attachment B

I, Gregory Yankow, have been a Special Agent with the Federal Bureau of Investigation (FBI) for approximately ten and one-half years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of the relevant facts; b) my review of public, business, bank and other records; c) my review of consensual audio and video recordings, and draft transcripts and summaries thereof; d) my review of text messages; and e) information provided by other law enforcement agents who have conducted interviews or who have themselves obtained information that has been shared with me. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the misconduct described in the Complaint, it does not include every act known to me concerning the investigation as to the defendants named herein or others not so named. I have set forth only those facts that I believe are sufficient to establish the foundation for the Complaint. Where the content of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in substance and in part. Where portions of consensually recorded conversations are detailed, a good faith effort has been made to accurately capture the words spoken, and are reflected herein in quotation marks.

## SUMMARY

1. For several years, HHS-OIG, the Federal Bureau of Investigation ("FBI") and other federal law enforcement agencies have been investigating defendant BLS and related individuals and entities. The investigation has revealed that, beginning in or around 2006 and continuing at least through 2013, defendant BLS, defendant DAVID NICOLL, defendant SCOTT NICOLL, defendant CRAIG NORDMAN, and others (the "BLS defendants") have conspired to run a massive physician bribery operation. Through the conspiracy, the BLS defendants induced numerous physicians, including defendant FRANK SANTANGELO, to refer their patients' blood specimens to defendant BLS, allowing defendant BLS to receive at least tens of millions of dollars from the Medicare Program and private health insurance companies.

2. To effectuate the conspiracy and disguise their bribe payments, the BLS defendants utilized sham lease agreements, sham service agreements, and sham consulting agreements, among other methods, to induce physicians to refer patient blood samples to BLS and induce them to order unnecessary tests.

3. Sham lease agreements: while leasing space within physicians' offices from the physicians (purportedly so a BLS employee could work in the physicians' offices taking blood samples from patients), the BLS defendants leased substantially more space than was actually used by defendant BLS, thus causing the payments to the physicians to be for substantially more money than if they had been legitimate, arms-length, negotiated leases.

4. Sham service agreements: the BLS defendants entered into service agreements through which defendant BLS paid physicians above market value for performing basic blood drawing tasks that many of the physicians would have undertaken even if they were not paid substantial sums by defendant BLS to do so.

5. When a change in New Jersey state law in 2010 made it more difficult for the BLS defendants to utilize sham lease agreements and sham service agreements to disguise their bribe payments, the BLS defendants funded a number of new entities, and used sham consultant agreements from those entities, among other methods, to disguise continued bribe payments to physicians. Defendant BLS provided these entities with at least $8 million. Of that amount, more than $1.6 million was withdrawn, as cash, in hundreds of individual transactions which rarely, if ever, exceeded the $10,000 threshold to trigger Currency Transaction Reporting requirements. In addition, at least $975,000 was paid to physicians by those entities pursuant to sham consultant agreements.

6. The BLS defendants used bribe payments to induce physicians to order unnecessary tests. For example, in one recorded conversation, described in further detail below, defendant SCOTT NICOLL told a physician (who was cooperating with the investigation) that the BLS defendants would pay the physician $1,500 per month pursuant to a sham consulting agreement if the physician increased the tests he was ordering for the physician's patients so as to double the payout defendant BLS was receiving from the physician's referrals.

7. Over the course of the charged Conspiracy, defendant BLS has had revenue of more than $200 million from the testing of blood specimens and related services, and defendant DAVID NICOLL has received distributions of more than $33 million.

## BACKGROUND

8. At all times relevant to this Complaint:

a. Biodiagnostic Laboratory Services, LLC ("BLS") was a clinical blood laboratory headquartered in Parsippany, New Jersey that, among other things, performed tests on the blood specimens of patients referred to BLS by physicians, and then billed payors and others for those tests and related services;

b. Defendant DAVID NICOLL was an owner and the President of BLS, and routinely exerted direct control over various aspects of the operations of BLS that are relevant to the Complaint;

c. Defendant SCOTT NICOLL was a senior BLS employee and DAVID NICOLL's brother;

d. The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title

18, United States Code, Section 24(b). Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries";

e. The Medicare Part B program was a federally funded supplemental insurance program that provided supplementary Medicare insurance benefits for individuals aged sixty-five or older, and certain individuals who are disabled. The Medicare Part B program paid for various medical services for beneficiaries, including blood tests and related services;

f. BLS was an approved Medicare provider, and Medicare paid BLS for performing blood tests and related services on beneficiaries who were referred to BLS by physicians participating in Medicare; and

g. Private health insurance companies (hereafter "Private Payors"), including Horizon Blue Cross/Blue Shield ("Blue Cross/Blue Shield"), were corporations in the business of providing health care insurance to individuals and entities under various insurance policies (the "insureds"), pursuant to which Blue Cross/Blue Shield and other Private Payors paid BLS for blood tests and related services performed for insureds who had been referred to BLS by physicians participating in their provider networks.

9. At various times relevant to this Complaint:

a. Defendant CRAIG NORDMAN – who is defendant DAVID NICOLL's and defendant SCOTT NICOLL's cousin – was an employee of defendant BLS and the Chief Executive Officer of Advantech Sales, LLC ("Advantech").

b. Defendant FRANK SANTANGELO was a physician who practiced medicine from offices in Wayne and Montville, New Jersey.

## OBJECT OF THE CONSPIRACY

10. The object of this conspiracy was for defendant BLS, defendant DAVID NICOLL, defendant SCOTT NICOLL, defendant CRAIG NORDMAN, and others to obtain additional revenue and profits by paying kickbacks and bribes to physicians for the referral of blood specimens from their patients to defendant BLS for testing and related services, which testing and related services defendant BLS would then bill for and use to obtain payment from Medicare, Blue Cross/Blue Shield, and other Private Payors.

## MANNER AND MEANS OF THE CONSPIRACY

11. It was a part of the conspiracy that one or more of the co-conspirators caused bribes from defendant BLS to be paid to numerous physicians through the use of sham lease agreements and sham service agreements, which were intended to conceal the existence, illegal nature, and purpose of the bribes.

12. It was a further part of the conspiracy that one or more of the co-conspirators set up and funded a number of entities, and used sham consultant payments and/or cash payments

from those entities, that were intended to conceal the existence, illegal nature, and purpose of the bribes.

## THE INVESTIGATION

13. The investigation has revealed that between 2006-2009, defendant BLS, defendant DAVID NICOLL, defendant SCOTT NICOLL, defendant CRAIG NORDMAN, and others utilized sham lease agreements and sham service agreements to disguise bribe payments to numerous physicians which were intended to, and did, induce physicians to refer patients' blood specimens to defendant BLS for testing and related services.

### 2006-2009 – The BLS Defendants Use Sham Lease Agreements & Sham Service Agreements To Bribe Physicians

14. Two coconspirators not charged as defendants herein, who were employees of defendant BLS for several years during the time period relevant to the Complaint – Peter Briehof and William Dailey – have cooperated in the investigation and provided information, which has proven reliable and credible, about the illegal activities of defendant BLS, defendant DAVID NICOLL, defendant SCOTT NICOLL, and defendant CRAIG NORDMAN based upon the cooperating witnesses' own experiences as BLS employees and conversations they have had with other BLS employees. Both Peter Briehof and William Dailey have acknowledged that they too committed numerous illegal acts on behalf of BLS, including using sham lease agreements and sham service agreements to disguise bribe payments to physicians. Both have agreed to plead guilty in this case.

15. Two physicians practicing in New Jersey – MD1 and MD2 – have acknowledged that they were bribed through sham lease agreements and sham service agreements to refer blood specimens to defendant BLS. Both are cooperating with the investigation and have agreed to plead guilty in this case.

16. The investigation has revealed that the BLS defendant bribed numerous physicians using sham lease agreements and sham service agreements between 2006-2009, paying millions of dollars to these physicians and receiving at least tens of millions of dollars from private health insurance companies and Medicare based on referrals from those physicians.

*An Example: Physician AC*

17. During the 2006-2009 period, defendant BLS entered into a sham lease agreement with AC, a physician practicing in New Jersey, in order to induce AC to refer blood specimens from AC's patients to defendant BLS. Although defendant BLS paid AC $2,200 per month for the purported lease of 676 square feet (plus "exclusive use" of the "lab area" and half of "all common areas") in AC's office, the space allocated to defendant BLS at AC's office was actually approximately 100 square feet. In addition, defendant BLS paid AC $2,400 per month pursuant to a sham service agreement.

18. During the 2006-2009 period, defendant BLS paid AC approximately $174,000 pursuant to the sham lease agreement and sham service agreement, and received more than $1 million from blood referrals from AC to defendant BLS from private health insurance companies and Medicare.

*An Example: Physician MD1*

19. During the 2006-2009 period, defendant BLS entered into a sham lease agreement with MD1, a physician practicing in New Jersey, in order to induce MD1 to refer blood specimens from MD1's patients to defendant BLS. Although defendant BLS paid MD1 $1,200 per month for the purported lease of 720 square feet in MD1's office, the space allocated to defendant BLS at MD1's office was actually only approximately 80 square feet, one half of a shelf in one examination room, one or two shelves in a refrigerator, and the use of a centrifuge, as needed, to spin the blood prior to pick-up. In addition, defendant BLS paid MD1 $600 per month pursuant to a sham service agreement.

20. During the 2006-2009 period, defendant BLS paid MD1 at least $53,000 pursuant to sham lease agreements and sham service agreements, and received more than $150,000 from blood referrals by MD1 to defendant BLS from private health insurance companies and Medicare.

*Defendant FRANK SANTANGELO*

21. During the 2006-2009 period, defendant BLS paid defendant FRANK SANTANGELO at least $700,000 pursuant to sham lease agreements and sham service agreements in order to induce defendant FRANK SANTANGELO to refer blood specimens from defendant FRANK SANTANGELO's patients to defendant BLS. During this time period, defendant BLS received more than $4 million from blood referrals by defendant FRANK SANTANGELO to defendant BLS from private health insurance companies and Medicare.

22. In or about January 2009, Blue Cross/Blue Shield paid defendant BLS – by check mailed to and received by defendant BLS – approximately $110,000 on claims and related items previously submitted by defendant BLS for blood testing on Blue Cross/Blue Shield insureds. Approximately $4,400 of the $110,000 was for claims by defendant BLS for testing blood specimens referred to defendant BLS by defendant FRANK SANTANGELO.

23. In a June 11, 2009, text message conversation, defendant DAVID NICOLL and defendant FRANK SANTANGELO discussed defendant BLS's use of lease agreements to induce blood referrals:

| | |
|---|---|
| SANTANGELO: | Hey dave did u give [a physician who was not at that time referring blood specimens to defendant BLS] a rent quote? |
| SANTANGELO: | I think u need to find out what he gets n then tell him how much u would bear [sic] it by. What do u think? |
| SANTANGELO: | [An associate of defendant FRANK SANTANGELO] says he's very loyal to current lab |
| DAVID NICOLL: | The lab he is with now was sold to another lab in Edison. We can find another guy! |
| SANTANGELO: | Another MD u mean |
| DAVID NICOLL: | yup |
| SANTANGELO: | K |
| DAVID NICOLL: | I will stop in to see him! |
| SANTANGELO: | Ok but I don't know what's his problem |
| DAVID NICOLL: | What? |
| SANTANGELO: | Y he won't use your lab |
| DAVID NICOLL: | What is it. |
| SANTANGELO: | I don't know y he won't use your lab if your rent is more than what he gets now! |
| DAVID NICOLL: | Some doctors are just loyal. Maybe his employee won't change companies. I will go see him. |
| SANTANGELO: | Good luck! He sounds like stubborn old fart! |
| DAVID NICOLL: | I met him! He is a really stubborn old fart. |
| SANTANGELO: | Figured! |

24. In an August 7, 2009, text message conversation between defendant DAVID NICOLL and defendant FRANK SANTANGELO, defendant DAVID NICOLL referenced paying defendant FRANK SANTANGELO $40,000-50,000 per month, and made clear that such payments were contingent on the referral of patient blood specimens by defendant FRANK SANTANGELO to defendant BLS:

| | |
|---|---|
| DAVID NICOLL: | I am not really sure what is going on at your offices but we haven't gotten over 10 bloods yet this month. Plu. |
| | [additional conversation] |
| DAVID NICOLL: | Frank, I really can't afford the 40-50,000 a month if the girls aren't going to be drawing any blood. |
| SANTANGELO: | Will take care of it when I get back [from a trip outside the United States]. U can call [an office employee of defendant FRANK SANTANGELO] for now! |
| SANTANGELO: | U no u can count on me! |
| SANTANGELO: | I never let u down! |

        SANTANGELO:     Also I'm going through a very hard time in my life right now. I know u understand.

[additional conversation]

DAVID NICOLL:     No problem. You know I am with you til the end. 100%.

SANTANGELO:     Ditto.

### The New Jersey Ban and the Creation of Defendant BLS-Funded Entities

25. Until July 2010, lease agreements and service agreements between clinical laboratories and physicians that met the relevant federal safe harbors of the Anti-Kickback Statute were also permitted under New Jersey state law under limited circumstances. A change in New Jersey law was proposed in October 2009 and enacted in July 2010, effectively prohibiting even legitimate lease and service payments from clinical blood laboratories to physicians (the "New Jersey Ban").

26. The New Jersey Ban was in response to an apparent plethora of reports "that rental agreements between laboratories and physicians for physician office collection stations [in the physicians' medical offices] exceed[ed] fair market value and influence[d] the selection of laboratory services," and that New Jersey state authorities lacked "any effective means of assuring that these rental agreements do not exceed fair market value." Consequently, on or about October 19, 2009, the New Jersey Department of Health and Senior Services proposed effectively prohibiting lease agreements and service agreements between clinical laboratories and physicians, and then enacted that ban, effective on or about July 19, 2010. 42 N.J.R. 1530(a), pg. 1532.

27. The investigation has revealed that in response to the New Jersey Ban, defendant BLS continued to bribe physicians by using newly created and funded entities to funnel bribes to physicians, among other methods.

28. After the New Jersey Ban was proposed, more than a half dozen such entities were formed. The investigation to date has revealed that, since November 2009, defendant BLS has provided these entities with more than $8 million. Of that amount, more than $1.6 million was withdrawn, as cash, in hundreds of individual transactions which rarely, if ever, exceeded the $10,000 threshold to trigger Currency Transaction Reporting requirements. In addition, at least $975,000 was paid to physicians by those entities pursuant to sham "consultant" agreements.

29. One such entity is Advantech, operated by defendant CRAIG NORDMAN. Advantech was formed on or about May 18, 2010. Advantech's primary bank account was opened with a check from defendant BLS on or about August 19, 2010, with defendant CRAIG NORDMAN as a signatory on the account. Defendant CRAIG NORDMAN – who was a direct employee of defendant BLS prior to that time – has held himself out as Advantech's Chief Executive Officer and virtually all of the approximately $1,327,000 which has been deposited into Advantech's primary bank account since it was opened has come from defendant BLS.

*Recorded Conversations between (1) MD1 and defendant SCOTT NICOLL and*
*(2) MD1 and defendant CRAIG NORDMAN*

30. Prior to the New Jersey Ban, MD1 – a cooperating witness who, as stated above, is a physician practicing in New Jersey – received bribe payments from defendant BLS in the form of payments pursuant to sham lease agreements and sham service agreements. In 2009, MD1 stopped sending patient blood specimens to defendant BLS for testing. In or around early November 2010, defendant SCOTT NICOLL and another individual came to MD1's office and stated that defendant BLS was no longer allowed to rent space in physicians' offices, but had another way of compensating physicians – as "consultants." MD1 was told that s/he would be paid $1,500 per month to be a consultant, and that MD1's consulting work would consist of a monthly lunch meeting with a representative of defendant BLS.

31. In 2011, at the direction of investigative agents, MD1 contacted defendant BLS and expressed an interest in the consultant relationship offered by defendant SCOTT NICOLL. In response, defendant CRAIG NORDMAN contacted MD1, and on or about July 29, 2011, presented MD1 with a business card which listed defendant CRAIG NORDMAN's title as Sales Consultant for defendant BLS and provided contact information for defendant CRAIG NORDMAN at defendant BLS.

32. Defendant CRAIG NORDMAN provided MD1 with an Advantech "Market Advisory Panel Consulting Agreement," which MD1 and defendant CRAIG NORDMAN executed on or about August 1, 2011. Among other things, the Market Advisory Panel Consulting Agreement provided that MD1, as a consultant, would be paid $1,500 every month as the "fair market value for the services rendered" by MD1, and that "the amount of compensation has not been determined in a manner that takes into account the value or volume of any referrals of business generated or which may be generated in the future between the parties for which payment may be made in whole or in part under federal or state healthcare programs."

33. However, defendant CRAIG NORDMAN told MD1 that, as a consultant, MD1's sole responsibility would be to fill out a one-page Advantech "Consultant Advisory Board Data Sheet" ("Advantech Sales Sheet") each month. The Advantech Sales Sheet took less than two minutes to complete, and typically posed generic questions such as how often sales representatives visited MD1's office, the insurance companies for which MD1 was in network, how much MD1's practice billed out-of-network, and whether MD1's patients were satisfied with their labs' service. For that work, MD1 was paid $1,500 per month between in or about August 2011 and April 2012, and again in or about December 2012.

34. MD1 thereafter engaged in a series of conversations with defendant CRAIG NORDMAN that were consensually audio/video recorded. During these conversations, defendant CRAIG NORDMAN stated to MD1 that Advantech had similarly engaged other physicians as consultants, and made clear that 1) the purpose of Advantech was to make

payments to physicians on behalf of defendant BLS that defendant BLS could no longer make directly; 2) the consulting arrangement was being used for the purpose of making payments from defendant BLS appear lawful; and 3) defendant BLS sought to use the payments not only to induce referrals of blood specimens, but also to induce physicians to increase the number of tests ordered on behalf of their patients.

35. On or about August 2, 2011, defendant CRAIG NORDMAN told MD1 that, as a consultant, "[t]here's nothing really demanding on your part. . . I'm not gonna trick you and say. . . oh, well you have to come to this thing every week . . . The only thing is just to keep a hundred percent legal . . . A lab can't pay a doctor . . . but I'm a company that does business with a lab and I can." The purpose of the Advantech Sales Sheet, defendant CRAIG NORDMAN explained, was "just in case if anybody comes looking that we have some paperwork that says, no we're not doing anything that's not supposed to be done. . ."

36. On or about September 7, 2011, when defendant CRAIG NORDMAN paid MD1 $1,500 for completing the one-page Advantech Sales Sheet, defendant CRAIG NORDMAN pulled the envelope containing MD1's check from a group of approximately five other envelopes.

37. In or about December 16, 2011, Medicare paid defendant BLS – by electronic transfer of funds from an account located outside the State of New Jersey to a bank account of defendant BLS located inside the State of New Jersey, a sum of money for claims and related items previously submitted by defendant BLS for blood testing on Medicare beneficiaries. A portion of those electronically transmitted funds was for claims by defendant BLS for testing blood specimens referred to defendant BLS by MD1.

38. Defendant CRAIG NORDMAN also made clear that the payments to MD1 were contingent upon MD1 referring blood specimens to defendant BLS and ordering sufficient tests on those specimens. In March of 2012, defendant CRAIG NORDMAN told MD1 that MD1's testing volume was insufficient, noting that "[w]e really have to kick it up a little." When MD1 then stated "[s]o you're saying in effect my productivity you know is ah related obviously to the pay ahm," Defendant CRAIG NORDMAN responded that "[i]t's not related but it has to cover the cost of it." Defendant CRAIG NORDMAN went on to state that MD1's low productivity was personally costing defendant CRAIG NORDMAN money, and further stated that "[I]f we [defendant BLS] got ... more tests out of each blood . . . we would do better. I mean even if we [defendant BLS] got 30 bloods from you a month, if we [defendant BLS] got more, like we [defendant BLS] have the allergy machine for ah food and respiratory allergy . . . the Amino CAT machine. We [defendant BLS] also do a gastrointestinal thing and an ahm unexplained fatigue panel. I think I gave you that stuff last time I was here. Ahm basically if you did more tests on the patients that you send us [defendant BLS], ahm it would be better, but ah obviously you do a lot of Medicare."

39. Defendant CRAIG NORDMAN had previously encouraged MD1 to add tests to be performed on the blood specimens referred to defendant BLS in order to increase referral

volume. In or about October 2011, defendant CRAIG NORDMAN explained to MD1 that the key to referral volume was the number of tests ordered, stating that other doctors "don't do ahm like 60 [bloods] but they do more tests… And that's where it really is. I mean if we get 10 bloods for $1,000 as opposed to 10 bloods for $4,000 or 5 bloods for $4,000 obviously there's more. We get paid a percentage obviously."

40. Defendant CRAIG NORDMAN also told MD1 that MD1 could make money by referring other physicians to defendant CRAIG NORDMAN who were in a position to refer patients' blood specimens to defendant BLS. But, defendant CRAIG NORDMAN stated, "I try not to have a consultant agreement with an account that I can't make the money back from the consultant agreement," and further stating "I just want to see if there's any way you could send us some allergies for food and respiratory . . . that would help us a lot. Cause the reimbursement's really good on that and we [defendant BLS] own the machines."

41. MD1's productivity did not materially improve thereafter and, at a meeting in or about April 2012, defendant CRAIG NORDMAN cancelled MD1's consulting arrangement with Advantech.

42. After defendant CRAIG NORDMAN cancelled MD1's consulting arrangement with Advantech, MD1 contacted (at the direction of investigative agents) defendant SCOTT NICOLL, resulting in two telephone conversations (on or about August 2, 2012, and August 27, 2012) between MD1 and defendant SCOTT NICOLL, both of which were consensually recorded. These conversations confirmed that 1) the purpose of Advantech was to make payments to physicians on behalf of defendant BLS that defendant BLS could no longer make directly; 2) the consulting arrangement was being used for the purposed of making payments from defendant BLS appear lawful; and 3) defendant BLS sought to use the payments not only to induce referrals of blood specimens, but also to induce physicians to increase the number of tests ordered on behalf of their patients.

43. On an August 2, 2012, call between defendant SCOTT NICOLL and MD1, MD1 thanked defendant SCOTT NICOLL for "your monthly checks from the company." MD1 also stated to defendant SCOTT NICOLL that "a couple of years ago you came to my office in Novemberish. You have offered me monthly lunch meetings I think it was to act as a consultant for your lab." Defendant SCOTT NICOLL responded "[r]ight." The conversation continued:

| | |
|---|---|
| MD1: | I was working with you know Advantech Sales for a while until recently when you know [defendant] CRAIG NORDMAN cut me off I guess for lack of volume. |
| SCOTT NICOLL: | Okay. |
| MD1: | I was gonna say since you're working at the front offices is there anything you can do to take me back as a consultant? I don't know. |

| | |
|---|---|
| SCOTT NICOLL: | Ahm I still have to look at the numbers box. Ahm I just like when we used to when we used to have your office and, and the rent was ahm you know the rent was good ahm when we are able to rent space, we had a lot of Blue Cross/Blue Shield coming out of there. |
| MD1: | Yeah, yeah you're right. |
| SCOTT NICOLL: | So since, since we can't take the Blue Cross/Blue Shield[1] ahm I would have to look at what you were sending and ahm I'll, I'll talk to [defendant] CRAIG [NORDMAN] and see if I can get that going again. Ahm, I am actually ah going away until Tuesday. |
| | [additional conversation] |
| MD1: | Alright. How, how many [blood] specimens do you think you would need to make ah my participation. |
| SCOTT NICOLL: | See I never, I never, I never look at it that way. It's what the insurance makes but ahm. You know as long as we're getting one or two of the good private insurances which are AETNA Medicare, I'm sorry AETNA, Cigna, ahm Oxford and United. As long as we are getting one of those four usually once every two days we're doing just fine normally. |
| MD1: | Uh, uh. |
| SCOTT NICOLL: | So I will ahm let me just sit down and let me just take a look at the numbers and ahm and I'll definitely look it over and I'm sure that there is something that we could work out. I, I have no doubt there will be something we can work out. |
| MD1: | Yeah if I, have you know again I have a most of the practice is Medicare now since I'm up there in years and most of the patients have you know come along with me so its hard for me to guarantee you a whole lot for the |
| SCOTT NICOLL: | yeah |
| MD1: | Alternate plans. But ahm, if ah |
| SCOTT NICOLL: | But the good thing with Medicare, the good thing with Medicare, they always pay. |
| MD1: | Uh, uh. |
| SCOTT NICOLL: | So if we're gettin' you know if we're gettin' 10 bloods a week from Medicare. |
| MD1: | Uh, uh. |

---

[1] Prior to this conversation, Blue Cross/Blue Shield began refusing to reimburse defendant BLS for services.

| | |
|---|---|
| SCOTT NICOLL: | You know we're looking at we're gonna be paid 8% of whatever we bill. So you know we usually looking at $800, $900 on 10 bloods. |
| MD1: | Uh, uh. |
| SCOTT NICOLL: | So long as we could do 10 you know a week, I'm sure we could work something out. |
| MD1: | Oh good. God love you. That would |
| SCOTT NICOLL: | ok? |

44. Defendant SCOTT NICOLL spoke to MD1 again on August 27, 2012. MD1 referred back to "our call I guess a couple of weeks ago," reiterated that "I'm really struggling here," and then asked defendant SCOTT NICOLL "[i]s there anything you can do for me?" This led to the following exchange:

| | |
|---|---|
| SCOTT NICOLL: | I mean I'm working, I'm just looking for you know like what we've gotten so far this month. |
| MD1: | Uh, uh. |
| SCOTT NICOLL: | Um you know you sent us we got 18 bloods at ahm like 20,000 [dollars] bill out so far. So in, in that thing I get, you know if I get 10% I make two, I make $2,000 out of that whole thing. |
| MD1: | Uh, uh. Alright. |
| SCOTT NICOLL: | So that's, that's where we're, that's where we're trying to figure out how you know how we can work something out you know where it is beneficial for both of us. You know cause I would like to be able to get you you know around 1,500 [dollars] a month if I can but I need we would either need more tests or more patients or something along those lines. Ahm you know those allergy panels, those allergy panels would definitely help us. |
| MD1: | Okay. |
| SCOTT NICOLL: | If we could get some of those going. |
| MD1: | Okay. |
| SCOTT NICOLL: | Ahm you know like I said I'm looking you're doing about a $1,000 a bag per patient. |
| MD1: | I get you. |
| SCOTT NICOLL: | Ahm if we could, we could somehow get that up in the two's then I'm looking at making 4,000 [dollars] and I have no problem paying you know 1,500 [dollars] for it. |
| MD1: | I see. Alright. |

45. Later in that conversation, MD1 stated that "[a]h then yeah I guess if I could double that volume you would think that would be satisfactory I guess, to which defendant SCOTT NICOLL responded, "[a]bsolutely. Yeah, absolutely we, we could start small you know and just see how it goes." Defendant SCOTT NICOLL then discussed the logistics of reinstating MD1 as a consultant, stating: "I'll send someone out, I'll send someone out with the consulting stuff. You know I'll send my cousin again." Later in the conversation, defendant SCOTT NICOLL confirmed that the "cousin" he was referring to was defendant CRAIG NORDMAN, stating - "I'll have Craig, I'll have Craig up there sometime next month with everything."

46. Thereafter, at the instruction of investigative agents, MD1 resumed referring patient blood specimens to defendant BLS at a higher volume.

47. On or about November 13, 2012, defendant CRAIG NORDMAN had a meeting with MD1 in which they discussed resuming Advantech payments to MD1. The meeting was consensually audio recorded. During it, defendant CRAIG NORDMAN noted that "the volume [of patient blood specimens sent to defendant BLS by MD1] went up" and included private insurance payors, which had higher reimbursement rates than Medicare. Before Advantech resumed payments to MD1, though, defendant CRAIG NORDMAN "want[ed] to talk to [defendant] SCOTT [NICOLL] about it again. . .," stating that if there were too many consultants in the same area "it looks like I have like why do I have five consultants in the same area . . . when you are getting the same information from them." On November 30, 2012, defendant CRAIG NORDMAN and MD1 had a second telephone conversation, which was consensually audio recorded. During that call, defendant CRAIG NORDMAN stated that he was ready to resume Advantech payments to MD1.

48. Subsequently, on or about December 3, 2012, defendant CRAIG NORDMAN and MD1 met. During the meeting, which was consensually audio recorded, defendant CRAIG NORDMAN told MD1 that MD1 would have to fill out a new contract to become an Advantech "consultant," which was similar to the one that MD1 filled out previously. When MD1 stated, "so, [defendant] SCOTT [NICOLL] was pleased with my productivity, I guess," defendant CRAIG NORDMAN responded, "yeah, and he was pleased with the fact that it went up by, you know, before we were only getting Medicare . . ."

49. MD1 filled out the one page "Advantech Sales Sheet," with assistance and direction from defendant CRAIG NORDMAN, and MD1 received a payment of $1,500 for December 2012. A copy of the Advantech Sales Sheet filled out by MD1 is attached as Exhibit 1 to this Complaint. From 2011-2012, defendant BLS, defendant SCOTT NICOLL, and defendant CRAIG NORDMAN, through Advantech, paid MD1 approximately $13,500 pursuant to the sham consulting agreement in exchange for MD1's referral of patient blood specimens to defendant BLS.

### Examples of the use of Advantech to bribe other physicians

50. The investigation has revealed arrangements between Advantech and various physicians which further demonstrate the co-conspirators' use of Advantech after the New Jersey Ban went into effect to make bribe payments to physicians on behalf of defendant BLS. For example:

51. Beginning in September 2010, approximately one month after the New Jersey Ban went into effect, physician AC's sham rental and service payments – which totaled approximately $4,600 per month – were replaced with $3,050 monthly rental payments to an entity controlled by AC and "consultant" payments of $1,500 per month, by check, from Advantech to AC for a total of $4,550 per month. In combination, these two monthly income streams replaced $4,550 of the $4,600 defendant BLS had been paying AC under the now prohibited lease agreements and service agreements.

52. During the 2006-2009 period, defendant BLS entered into a sham lease agreement with JF, a physician practicing in New Jersey. During that time, defendant BLS paid JF approximately $75,000 pursuant to the sham lease agreement, and received more than $370,000 from blood referrals from JF to defendant BLS from private health insurance companies and Medicare. Beginning in September 2010, approximately one month after the New Jersey Ban went into effect, JF's $1,500 sham lease payments were replaced with $1,250 monthly consultant payments through checks from Advantech. This amount was increased to $1,500 in November 2010.

### Conclusion

53. The investigation has uncovered no information that any physicians bribed by defendant BLS, defendant DAVID NICOLL, defendant SCOTT NICOLL, or defendant CRAIG NORDMAN, revealed to their patients the fact that they were receiving bribes to refer blood specimens to defendant BLS.

54. Defendant DAVID NICOLL became the primary owner of defendant BLS in September 2005. Between 2006-2012, defendant BLS has had revenue of more than $200 million from the testing of blood specimens and related services. During that six year time period, the annual revenue of defendant BLS has increased almost 400%.

55. During that same time period, defendant DAVID NICOLL has received distributions of more than $33 million from defendant BLS, and spent more than $5 million on high-end and collectible automobiles, including approximately $580,000 for a Yenko Nova and approximately $365,000 for a Yenko Chevelle – two highly collectible automobiles – approximately $300,000 for a Ferrari automobile, and approximately $291,000 for a Corvette; more than $700,000 to purchase a Manhattan apartment for a female companion; more than $600,000 on private jet charters; more than $392,000 on tickets to sporting events; more than $216,000 at electronics stores; and more than $154,000 at a gentleman's club/restaurant.



**Sales, LLC.**

210 Darling Avenue
Bloomfield, NJ 07003

December 2012

## Consultant Advisory Board Data Sheet

Consultant's Name ██████████   Consultant's City _____

Let's see how you feel about Advantech Sales, LLC.'s Consultant Program.

What is your representative's name? __CRAIG NORDMAL__

Do you feel you are compensated at fair market value for your time? (Circle one) **Yes**/No

If No, Please explain. _____

Does your representative visit your practice twice a month or more? (Circle one) Yes/**No**

Does your Sales Rep. answer all of your questions and deal with all of your concerns?

(Circle one) **Yes**/No

If No, Please explain. _____

Which Insurance companies is your office/practice In-Network with?

| 1 | OXFORD | 4 | AMERIHEALTH | 7 | |
|---|---|---|---|---|---|
| 2 | UNITED | 5 | | 8 | |
| 3 | AETNA | 6 | | 9 | |

Which Insurance companies does your office/practice bill Out-of-Network?

| 1 | N/A | 4 | N/A | 7 | |
|---|---|---|---|---|---|
| 2 | | 5 | | 8 | |
| 3 | | 6 | | 9 | |

Patents satisfied by services provided through Advantech Sales, llc. __90__%

Chief complaints: _____

Note: Your information is safe with us. We do not sell any of the information provided herein. The answers provided